IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA19-741

Filed: 6 October 2020

Cabarrus County, Nos. 17 CRS 50307-08

STATE OF NORTH CAROLINA

v.

RAFAEL ALFREDO PABON, Defendant.

Appeal by defendant from judgments entered 14 December 2018 by Judge Christopher W. Bragg in Cabarrus County Superior Court. Heard in the Court of Appeals 12 May 2020.

> *Attorney General Joshua H. Stein, by Special Deputy Attorney General Ryan Frank Haigh, for the State.*
>
> *Currin & Currin, by George B. Currin, for defendant-appellant.*

BERGER, Judge.

On December 14, 2018, a Cabarrus County jury found Rafael Alfredo Pabon ("Defendant") guilty of first-degree kidnapping and second-degree forcible rape. Defendant appeals, arguing that (1) the trial court erred when it denied his motions to dismiss; (2) the trial court erred when it admitted 404(b) evidence; (3) the trial court erred when it admitted expert testimony; (4) the indictments were facially invalid; (5) the trial court committed plain error when it failed to properly instruct the jury; (6) the trial court erred when it allowed the jury to consider evidence of

aggravating factors; and (7) the trial court erred when it ordered Defendant to enroll in satellite-based monitoring ("SBM"). We disagree.

Factual and Procedural Background

In November 2015, Defendant met Samantha Ivethe Camejo-Forero ("the victim") to discuss a roof repair warranty. The victim and Defendant subsequently developed a friendship, and she would ask Defendant for assistance with her home repair business.

On January 4, 2017, Defendant drove to the victim's house to take her to breakfast. At 8:36 a.m., the victim left her house in Defendant's vehicle. Defendant handed her a latte to drink. The victim drank the latte and began "feeling weird." Throughout the car ride, the victim "couldn't think[, and] couldn't move."

At 9:42 a.m., Defendant and the victim arrived at a Denny's restaurant for breakfast. The restaurant was 42 miles away from the victim's house. Defendant and the victim sat on the same side of the booth, which the victim stated was abnormal. The victim "couldn't even read" the menu and had no recollection of what she ordered or whether she ate. She testified that she was not "in control of [her] body," and at one point, the victim appeared to be asleep at the table.

At 10:28 a.m., Defendant and the victim left the Denny's restaurant and drove to get the mail for Defendant's friend. After driving for 16 miles, they arrived at Defendant's friend's house at 11:04 a.m. While at the house, the victim testified that

she was sitting on a couch when Defendant began kissing and touching her, including kissing her breast. The victim did not want to be kissed or touched by Defendant. Defendant then took the victim to a bedroom where he laid her on the bed. Defendant said, "You don't know how bad I want this," and took off the victim's clothes. Defendant then engaged in nonconsensual vaginal intercourse with the victim. Soon after, the victim went to the bathroom and saw a used condom.

At 12:48 p.m., Defendant and the victim started the drive back to the victim's house. Around 12:49 p.m., the victim talked with her mother on the phone but could not remember the conversation. Her mother testified that the victim was "speaking in a very slurred kind of way." The victim recalled that while in the car, Defendant acted "like nothing had happened."

At 1:34 p.m., the victim arrived home. Before the victim went inside, Defendant said, "Give me a kiss." The victim, appearing to her mother to be "very pale . . . like a zombie or a dead person," then went into her mother's room, without speaking, and fell asleep.

Around 5:00 p.m. that afternoon, the victim awoke. She felt "weird," "couldn't walk straight," and "knew what happen[ed]." At 5:23 p.m., the victim texted Defendant the following:

> Hi Rafa. I would like to ask you what happened at Denny's.
> Did I finish my breakfast? I told that you I didn't feel well,
> I feel weird, and I almost couldn't walk real good. I came

home and I just pass out until now, and I still feel in me
weird. What happen?

At 5:28 p.m., Defendant called the victim. Defendant told the victim that

nothing had happened. According to her, Defendant said, "We just pick[ed] up the

mail, you wait[ed] for me in the car, and -- I took you back home." Defendant told the

victim that they were at his friend's house for "five minutes, no more than that." Once

the parties hung up, the victim fell back asleep until the next morning.

On January 5, the victim again called Defendant because she was "still feeling

weird, . . . like it was a dream[.]" The victim then contacted the Matthews Police

Department and was directed to take a rape test at a hospital. The victim left for the

hospital "dressed the exact same way that she was [the] night before." The victim

told medical professionals and law enforcement officers what she remembered about

the incident.

On January 6, 2017, the victim gave a formal statement to detectives. She

granted detectives access to her phone, her location data, and subsequently provided

a hair sample. On January 23, 2017, Defendant was indicted on charges of second-

degree forcible rape and first-degree kidnapping.

At trial, Frank Lewallen, a forensic scientist at the North Carolina State Crime

Laboratory, testified that he reviewed the procedures and the results of the victim's

blood and urine samples. Lewallen testified that the initial urine test was positive

for Amphetamine, Methylenedioxyamphetamine, and Benzodiazepine. The State

Crime Lab then conducted confirmatory testing of the urine samples using gas chromatography mass spectrometry ("GCMS"). The victim's urine tested positive for a 7-aminoclonazepam, "a breakdown product of Clonazepam[,] which is a Benzodiazepine." Lewallen confirmed that Clonazepam is a "central nervous depressant" with side effects of "feeling like they were in a dream . . . [and] a loss of inhibition or loss of anxiety."

Dr. Ernest Lykissa, a clinical and forensic toxicologist, testified that he tested the victim's hair sample, which represented hair growth from December 22, 2016 to January 19, 2017. After testing the hair sample with a liquid chromatograph mass spectrometer, Dr. Lykissa determined the victim's hair contained Cyclobenzaprine – a muscle relaxant. Cyclobenzaprine "floods the brain with serotonin," the neurotransmitter that causes sleep, but in excess, can "numb [a person] to death." Dr. Lykissa also confirmed the State Crime Lab's conclusion that Clonazepam was in the victim's urine. Like Cyclobenzaprine, Clonazepam has numbing effects that "make [a person] very sleepy." The effect of taking Cyclobenzaprine and Clonazepam together results in a "[v]ery serious impairment of [a person's] mental and physical faculties." If a person were to take these two drugs with caffeine, they "can't see well, . . . can't hear well, . . . and [they're] very close to [their] demise." Dr. Lykissa concluded that the victim's symptoms were consistent with someone who recently took Cyclobenzaprine, Clonazepam, and caffeine.

Lucy Montminy, a sexual assault nurse examiner, testified to treating the victim at Novant Health on January 5, 2017. During in-take, the victim identified Defendant as her assailant. Montminy testified that the victim's mannerisms were consistent with an individual who was "under the influence of impairing substances." The victim was prescribed various antibiotics to treat any potential sexually transmitted disease. None of these medications contained Cyclobenzaprine or Clonazepam. Other than these prescribed medications, the victim "was not taking any medications." Montminy testified that during her examination of the victim, she discovered an "injury to [the victim's] vaginal area" that was "consistent with penetration." Montminy's observations were consistent with drug related rape.

Kari Norquist, a forensic scientist, testified that she conducted DNA analysis on the victim's rape test samples, which included swabs of the victim's left breast. Norquist determined there were substantial amounts of Defendant's DNA on the victim's left breast sample, and that the amount of Defendant's DNA on the victim's left breast was not common with a casual transfer of DNA.

Outside the presence of the jury, the trial court conducted a voir dire hearing related to 404(b) evidence from Chanel Samonds and Elise Weyersburg. The trial court determined that their testimony was admissible, and provided a limiting instruction to the jury.

Samonds, Defendant's sister-in-law, testified that Defendant came to her house on the morning of September 8, 2008. After Samonds asked Defendant to leave, he stood up, "tried to kiss [Samonds'] neck" and "pushed [her] back down on the couch[, a]nd pinned [her] hands above [her] head so that he could start kissing [her]." Despite Samonds' objections and refusal, Defendant attempted to kiss her mouth. Defendant then removed Samonds' pants and digitally penetrated her vagina. With Samonds "half on the couch and half off the couch," Defendant then engaged in nonconsensual vaginal intercourse with Samonds.

Weyersberg, Defendant's other sister-in-law, testified that around 2006 when she was 19 or 20 years old, she was living with her parents along with Defendant and his wife. During this time, Weyersberg "felt uncomfortable with" Defendant. On one occasion, Weyersberg was in the kitchen when Defendant came behind her and rubbed her shoulders while moving his hands towards her breasts. At the same time, Defendant told her "how he had an orgy in Bolivia" while she continued to move away from him because she felt "very uncomfortable." Weyersberg did not tell her parents about the incident. On a separate occasion, Weyersberg was on the computer when Defendant approached her and asked if she wanted a massage. At the same time, Defendant was "trying to put his hand up the bottom of [her] pant leg." Weyersberg then left the room and later told her parents about the incident.

Defendant testified at trial that he picked the victim up for breakfast on January 4, went to the Denny's restaurant, and then stopped at his friend's house. Defendant testified that he and the victim engaged in sexual and physical activity at his friend's house.

A Cabarrus County jury found Defendant guilty of second-degree forcible rape and first-degree kidnapping. The jury also found as an aggravating factor that Defendant took advantage of a position of trust or confidence for each charge. Defendant was sentenced to consecutive terms of 104 to 137 months and 104 to 185 months in prison.

Defendant appeals, arguing that (1) the trial court erred when it denied his motions to dismiss; (2) the trial court erred when it admitted 404(b) evidence; (3) the trial court erred when it admitted expert testimony; (4) the indictments were facially invalid; (5) the trial court committed plain error when it failed to properly instruct the jury; (6) the trial court erred when it allowed the jury to consider evidence of aggravating factors; and (7) the trial court erred when it ordered Defendant to enroll in SBM. We disagree.

<u>Analysis</u>

I. <u>Motion to Dismiss</u>

Defendant contends the trial court erred when it denied his motion to dismiss the charge of first-degree kidnapping and the aggravating factors based on

insufficient evidence.[1]  Defendant also asserts that the trial court erred when it denied his motion to dismiss on double jeopardy grounds.  We disagree.

"This Court reviews the trial court's denial of a motion to dismiss *de novo*." *State v. Smith*, 186 N.C. App. 57, 62, 650 S.E.2d 29, 33 (2007) (citation omitted).  "If there is more than a scintilla of competent evidence to support the allegations in the warrant or indictment, it is the court's duty to submit the case to the jury."  *State v. Horner*, 248 N.C. 342, 344-45, 103 S.E.2d 694, 696 (1958).  "The terms 'more than a scintilla of evidence' and 'substantial evidence' are in reality the same and simply mean that the evidence must be existing and real, not just seeming or imaginary." *State v. Earnhardt*, 307 N.C. 62, 66, 296 S.E.2d 649, 652 (1982) (citation omitted). "Substantial evidence is that amount of relevant evidence necessary to persuade a rational juror to accept a conclusion."  *State v. Scott*, 356 N.C. 591, 597, 573 S.E.2d 866, 869 (2002) (citation omitted).  "In ruling on a motion to dismiss for insufficient evidence, the trial court must consider the evidence in the light most favorable to the State, which is entitled to every reasonable inference which can be drawn from that evidence."  *State v. Dick*, 126 N.C. App. 312, 317, 485 S.E.2d 88, 91 (1997) (citation omitted).

A. First-Degree Kidnapping

---

[1] Defendant states in his brief that he "moved to dismiss all charges against him" on the grounds of insufficient evidence.  However, Defendant does not argue in his brief that there was insufficient evidence of the second-degree forcible rape charge.  Thus, Defendant has abandoned this argument.  N.C. R. App. P. 28(b)(6).

First-degree and second-degree kidnapping offenses are set forth in N.C. Gen. Stat. § 14-39.  The relevant portions of that Section state:

> (a)     Any person who shall unlawfully confine, restrain, or remove from one place to another, any other person 16 years of age or over without the consent of such person, . . . shall be guilty of kidnapping if such confinement, restraint or removal is for the purpose of:
>
> . . .
>
> > (2)     Facilitating the commission of any felony or facilitating flight of any person following the commission of a felony[.] . . .
>
> (b)     There shall be two degrees of kidnapping as defined by subsection (a). *If the person kidnapped . . . [was] sexually assaulted, the offense is kidnapping in the first degree and is punishable as a Class C felony.* If the person kidnapped was released in a safe place by the defendant and had not been seriously injured or sexually assaulted, the offense is kidnapping in the second degree and is punishable as a Class E felony.

N.C. Gen. Stat. § 14-39 (2019) (emphasis added).

Defendant argues that because there was evidence of only one sexual assault, he could not be convicted of, and sentenced for, first-degree kidnapping.  Defendant correctly asserts that when the sexual assault and the felony that is the object of the kidnapping are the same, "a defendant may be convicted of first degree kidnapping and the underlying sexual offense which raised it to first degree, although the defendant cannot be punished for both."  *See State v. Freeland*, 316 N.C. 13, 23-24, 340 S.E.2d 35, 40-41 (1986).  The proper remedy in the event of a conviction for first-

degree kidnapping and the sexual assault that constitutes an element of the first-degree kidnapping charge is to arrest judgment on the first-degree kidnapping charge and resentence defendant for second-degree kidnapping. *See State v. Mason*, 315 N.C. 724, 737, 340 S.E.2d 430, 439 (1986).

Here, however, the State's evidence tended to show Defendant committed at least two sexual assaults against the victim. The State satisfied the sexual assault element of first-degree kidnapping with evidence of a separate and distinct sexual battery. This occurred when Defendant kissed the victim's breasts on the couch. The subsequent second-degree rape was not used to satisfy the sexual assault element of first-degree kidnapping. As such, both the first-degree kidnapping and second-degree forcible rape are properly charged and sentenced.

A defendant may be convicted of second-degree forcible rape if the State proves the Defendant engaged in vaginal intercourse

> (1) By force and against the will of the other person; or
> (2) Who has a mental disability or who is mentally incapacitated or physically helpless, and the person performing the act knows or should reasonably know the other person has a mental disability or is mentally incapacitated or physically helpless.

N.C. Gen. Stat. § 14-27.22(a)(1-2) (2019).

A person is guilty of sexual battery if the person

> for the purpose of sexual arousal, sexual gratification, or sexual abuse, engages in sexual contact with another person:

> (1)    By force and against the will of the other person; or
> (2)    Who has a mental disability or who is mentally incapacitated or *physically helpless*, and the person performing the act knows or should reasonably know that the other person has a mental disability or is mentally incapacitated or physically helpless.

N.C. Gen. Stat. § 14-27.33(a)(1-2) (2019) (emphasis added).  "[T]he element of acting for the purpose of sexual arousal, sexual gratification, or sexual abuse may be inferred from the very act itself."  *In re: S.A.A.*, 251 N.C. App. 131, 135, 795 S.E.2d 602, 605 (2016) (*purgandum*).  Sexual contact includes "[t]ouching the sexual organ, anus, breast, groin, or buttocks of any person."  N.C. Gen. Stat. § 14-27.20(5)(a) (2019).

The jury could infer from Defendant's actions that he acted "for the purpose of sexual arousal, sexual gratification, or sexual abuse," *In re: S.A.A.*, 251 N.C. App. at 135, 795 S.E.2d at 605, when he touched and kissed the victim's breasts.  *See State v. Schultz*, 88 N.C. App. 197, 201, 362 S.E.2d 853, 856 (1987) (finding circumstantial evidence of intent where "the victim testified that defendant dragged her down a hallway toward a guest bedroom, and that he put his hand down over her shoulder and down the front of her shirt and grabbed her breasts.").  Therefore, there was sufficient evidence from which the jury could determine that Defendant committed a sexual battery.

The fourth element of first-degree kidnapping requires that Defendant committed a sexual assault separate and distinct from the second-degree forcible rape. If the jury determines that Defendant committed both offenses, the charges will be determined to be separate and distinct since sexual battery is not an element of second-degree forcible rape. The trial court gave the following jury charge for first-degree kidnapping:

> The defendant has been charged with first degree kidnapping. For you to find the defendant guilty of this offense, the State must prove five things beyond a reasonable doubt. First, that the defendant unlawfully restrained a person; that is, restricted her freedom of movement and/or removed her from one place to another;
>
> Second, that the person did not consent;
>
> Third, that the defendant restrained and/or removed that person for the purpose of facilitating defendant's commission of second degree forcible rape. Second degree forcible rape, as I earlier instructed you, is when a defendant engages in vaginal intercourse with the alleged victim and at that time the alleged victim was so substantially incapable of resisting an act of vaginal intercourse as to be mentally incapacitated and/or so physically unavailable to resist an act of vaginal intercourse as to be physically helpless and that the defendant knew or should reasonably have known that the alleged victim was mentally incapacitated and/or physically helpless;
>
> Fourth, *that this restraint and/or removal was a separate, complete act independent of and apart from the second degree forcible rape*;
>
> And, fifth, that the person had been sexually assaulted.

- 13 -

In this case, the State is alleging that the sexual assault committed by the defendant is sexual battery. To prove sexual battery, the State must prove three things beyond a reasonable doubt. First, that the defendant engaged in sexual contact with another person. Sexual contact means touching the breast of any person;

Second, that the alleged victim was mentally incapacitated and/or physically helpless and the defendant knew or should reasonably have known that the alleged victim was mentally incapacitated and/or physically helpless;

And, third, that the defendant acted for the purpose of sexual gratification.

If you find from the evidence beyond a reasonable doubt that on or about the alleged date the defendant unlawfully restrained a person and/or removed a person from one place to another and that the person did not consent, and that this was done for the purpose of facilitating the defendant's commission of second degree forcible rape, *and that this restraint and/or removal was a separate, complete act independent of and apart from the second degree forcible rape*, and that the person restrained and/or removed had been sexually assaulted, it would be your duty to return a verdict of guilty of first degree kidnapping. If you do not so find or have a reasonable doubt as to one or more of these things, you would not return a verdict of guilty of first degree kidnapping.

(Emphasis added).

For a criminal defendant to be "charged and convicted of two separate counts of assault stemming from one transaction, the evidence must establish a distinct interruption in the original assault followed by a second assault, so that the subsequent assault may be deemed separate and distinct from the first." *State v.*

*Littlejohn*, 158 N.C. App. 628, 635, 582 S.E.2d 301, 307 (2003) (*purgandum*). Further, this Court has previously held that "rape is not a continuing offense." *State v. Owen*, 133 N.C. App. 543, 552, 516 S.E.2d 159, 165 (1999) (*purgandum*).

At trial, Defendant admitted that he touched the victim on the couch. Further, the State's evidence tended to show that Defendant touched and kissed the victim's breasts while she was on the couch. After the first sexual battery occurred, there was a distinct and intentional interruption in the incidents when Defendant removed the victim from the couch to the bedroom where he then committed second-degree forcible rape.

Because the State presented substantial evidence of sexual battery, which was the underlying sexual assault for the first-degree kidnapping charge, the trial court did not err when it denied Defendant's motion to dismiss. In addition, the trial court's instructions to the jury correctly state the law for the jury to consider.

Defendant similarly argues that his convictions and sentences for first-degree kidnapping and second-degree forcible rape violated the prohibition against double jeopardy. Defendant's argument is without merit.

> The general rule is that the double jeopardy clause of the Federal Constitution protects an individual from being subjected to the hazards of trial and possible conviction more than once for an alleged offense. . . . If the legislature has specifically authorized cumulative punishment for the same conduct under two statutes the prosecutor may seek and the trial court or jury may impose cumulative punishment under such statutes in a single

trial. If cumulative punishment is not so authorized, a defendant may only be punished under one statute.

*Freeland*, 316 N.C. at 21, 340 S.E.2d at 39 (citations and quotation marks omitted).

"[T]he legislature did not intend that defendants be punished for both the first degree kidnapping and the underlying sexual assault." *Id.* at 23, 340 S.E.2d at 40-41. "Therefore, it is a double jeopardy violation to convict and sentence a defendant for both first degree kidnapping and the sexual offense that constituted the sexual assault element of the first degree kidnapping charge." *State v. Barksdale*, 237 N.C. App. 464, 473, 768 S.E.2d 126, 132 (2014) (citation omitted).

Defendant was convicted for first-degree kidnapping and second-degree forcible rape. However, Defendant was not convicted of sexual battery, the underlying sexual assault for first-degree kidnapping. This is distinguishable from *Barksdale* where the defendant was convicted of both first-degree kidnapping and the underlying sexual assault. *Id.* at 474, 768 S.E.2d at 132. Thus, Defendant's conviction for first-degree kidnapping did not violate his double jeopardy protections. Moreover, the State presented sufficient evidence of two separate sexual acts – second-degree forcible rape and sexual battery. Therefore, Defendant was properly convicted of second-degree forcible rape and first-degree kidnapping where sexual battery was the underlying sexual assault, not the second-degree forcible rape.

The trial court properly instructed the jury that in order to find Defendant guilty of first-degree kidnapping, they had to find that the victim's "restraint and/or

removal was a separate, complete act independent of and apart from the intended second degree forcible rape" and that the victim "had been sexually assaulted," which the State alleged was a "sexual battery." The trial court then instructed the jury as to the elements of sexual battery. Finally, the trial court instructed the jury,

> If you do not find the defendant guilty of first degree kidnapping, you must determine whether the defendant is guilty of second degree kidnapping. Second degree kidnapping differs from first degree kidnapping only in that it is unnecessary for the State to prove that the person had been sexually assaulted.

Moreover, the verdict sheet specifically required the jury to find Defendant committed a sexual battery before finding Defendant guilty of first-degree kidnapping. The verdict sheet for first-degree kidnapping specifically stated:

> We, the jury, as to the charge of First Degree Kidnapping (*supported by a unanimous finding that the defendant committed a sexual battery*), unanimously find the Defendant, Rafael Alfredo Pabon, to be:

(Emphasis added).

For the reasons stated herein, and because the trial court limited the jury's consideration of the sexual assault element of first-degree kidnapping to sexual battery, we conclude that Defendant's constitutional protection of double jeopardy was not violated.

B. <u>Aggravating Factors</u>

Defendant argues that the trial court erred when it denied his motion to dismiss the aggravating factors for insufficiency of the evidence. We disagree.

- 17 -

The only aggravating factor the trial court submitted to the jury was whether "[t]he defendant took advantage of a position of trust or confidence, including a domestic relationship, to commit the offense." N.C. Gen. Stat. § 15A-1340.16(d)(15) (2019). "A finding of this aggravating factor depends on the existence of a relationship between the defendant and victim generally conducive to reliance of one upon the other." *State v. Helms*, 373 N.C. 41, 44, 832 S.E.2d 897, 899 (2019) (citation and quotation marks omitted). "We have upheld a finding of the 'trust or confidence' factor in very limited factual circumstances." *Id.* at 44, 832 S.E.2d at 899 (citation omitted). *See also State v. Potts*, 65 N.C. App. 101, 105, 308 S.E.2d 754, 757 (1983) (finding sufficient evidence of a "position of trust" where the victim was considered one of defendant's "best friends").

Here, the State's evidence tended to show that Defendant and the victim were friends. The victim had pictures of Defendant and his family on her phone. Defendant gave Christmas presents to the victim's family. The victim asked Defendant to check on her mother while the victim was out of the country. Defendant testified that they frequently had personal conversations over coffee. The two would go shopping, see movies, and eat meals together. The victim sought out and relied on Defendant's advice for her home renovation business, and Defendant helped her improve her business.

Thus, the State presented substantial evidence that Defendant and the victim had a relationship in which the victim relied upon Defendant, that he maintained a position of trust with the victim, and he took advantage of that position to kidnap and rape the victim.

II. Rule 404(b)

Defendant next argues that the trial court erred when it admitted the 404(b) evidence of prior sexual assaults against Samonds and Weyersberg. We disagree.

> When the trial court has made findings of fact and conclusions of law to support its 404(b) ruling . . . we look to whether the evidence supports the findings and whether the findings support the conclusions. We review de novo the legal conclusion that the evidence is, or is not, within the coverage of Rule 404(b). We then review the trial court's Rule 403 determination for abuse of discretion.

*State v. Beckelheimer*, 366 N.C. 127, 130, 726 S.E.2d 156, 159 (2012).

Under Rule 404(b) of the North Carolina Rules of Evidence,

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake, entrapment or accident.

N.C. Gen. Stat. § 8C-1, Rule 404(b) (2019).

Rule 404(b) is "a clear general rule of inclusion of relevant evidence of other crimes, wrongs or acts by a defendant." *State v. Coffey*, 326 N.C. 268, 278-79, 389 S.E.2d 48, 54 (1990). "[S]uch evidence is admissible as long as it is relevant to any

- 19 -

fact or issue other than the defendant's propensity to commit the crime." *State v. White*, 340 N.C. 264, 284, 457 S.E.2d 841, 852-53 (1995) (citation omitted).

Admission of 404(b) evidence "is constrained by the requirements of similarity and temporal proximity." *State v. Al-Bayyinah*, 356 N.C. 150, 154, 567 S.E.2d 120, 123 (2002) (citations omitted). "Evidence of a prior bad act generally is admissible under Rule 404(b) if it constitutes substantial evidence tending to support a reasonable finding by the jury that the defendant committed the *similar* act." *Id.* at 155, 567 S.E.2d at 123 (citation and quotation marks omitted) (emphasis in original).

Prior bad acts are sufficiently similar "if there are some unusual facts present in both crimes" that "would indicate that the same person committed both." *State v. Stager*, 329 N.C. 278, 304, 406 S.E.2d 876, 890-91 (1991) (citations and quotation marks omitted). However, "[w]e do not require that the similarities rise to the level of the unique and bizarre." *Beckelheimer*, 366 N.C. at 131, 726 S.E.2d at 159 (citation and quotation marks omitted). "[T]his Court has been markedly liberal in admitting evidence of similar sex offenses by a defendant for the purposes [outlined] in Rule 404(b)." *State v. Bagley*, 321 N.C. 201, 207, 362 S.E.2d 244, 247 (1987) (citation and quotation marks omitted).

Here, the trial court found the testimony of Samonds and Weyersberg admissible as evidence of a common plan or scheme under Rule 404(b). The trial

court concluded that the evidence was sufficiently similar and satisfied the Rule 403 balancing test.

The trial court found sufficient similarities between the prior bad acts and the crime at issue in this case, highlighting that "[t]he acts between Ms. Samonds and [the victim were] rape . . . the criminal act is as identical as you can get. But . . . the act with Ms. Weyersberg was a sexual – at least a sexual battery in that matter with an intent to go further which did not occur." We agree with the trial court.

First, each woman testified that Defendant gained their trust prior to each incident. Samonds "never felt threatened" by Defendant, and she specifically testified that on the day of her assault, she "didn't really think anything about" Defendant coming over or that "he's lying to [her] just to come over." Weyersberg trusted Defendant because her parents allowed him to live with her sister in their family house, where she also lived. Likewise, the victim testified that she trusted Defendant because she had a mentorship-like relationship with him and also spent a significant amount of time with Defendant.

Second, Defendant utilized that position of trust to sexually assault each woman. Samonds testified that she sat next to Defendant on the couch where he then began to kiss her and eventually rape her. Weyersberg testified that Defendant massaged her shoulders to then touch her breasts and that he put his hand up her pant leg while asking if she wanted to use "massage oils with him." The victim

testified that she drank a coffee that Defendant gave her and immediately began feeling "feeling weird" before he sexually assaulted her.

Finally, in each situation, Defendant tried to persuade each victim that he had not sexually assaulted them. Therefore, the trial court did not err in finding the testimony was sufficiently similar because the evidence tended to show that in each circumstance the victim trusted Defendant and Defendant then abused this position of trust to assault each woman.

There is no bright line rule regarding temporal proximity for the purposes of Rule 404(b) testimony. *See State v. Maready*, 362 N.C. 614, 624-25, 669 S.E.2d 564, 570 (2008). Our courts have previously held 27 years was not too remote to satisfy this requirement. *See State v. Register*, 206 N.C. App 629, 637-39, 698 S.E.2d 464, 470-71 (2010). Here, the trial court found that the "temporal proximity [requirement was] met" despite the 10-year and 8-year attenuation, considering the "common scheme and plan or intent" of the Defendant. We agree. Our Supreme Court has held that "[w]hen similar acts have been performed continuously over a period of years, the passage of time serves to prove, *rather than disprove*, the existence of a plan" rendering the prior bad acts "not too remote to be considered as evidence of defendant's common scheme to abuse the victim sexually." *State v. Shamsid-Deen*, 324 N.C. 437, 445, 379 S.E.2d 842, 847 (1989) (emphasis added) (citation omitted).

Because these acts were performed continuously over a period of years, the acts were not too remote to be considered for the purposes of 404(b).

Finally, the trial court must consider the evidence in the context of Rule 403. Rule 403 provides that "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice[.]"  N.C. Gen. Stat. § 8C-1, Rule 403 (2019).  This determination is left to the sound discretion of the trial court.  *See Beckelheimer*, 366 N.C. at 130, 726 S.E.2d at 159.

"A trial court abuses its discretion if its determination is manifestly unsupported by reason and is so arbitrary that it could not have been the result of a reasoned decision.  We determine whether a trial court abused its discretion by looking at the totality of the circumstances."  *State v. Ross*, 207 N.C. App. 379, 389, 700 S.E.2d 412, 419 (2010) (citations and quotation marks omitted).  Since "[e]vidence which is probative of the State's case necessarily will have a prejudicial effect upon the defendant; the question is one of degree."  *Coffey*, 326 N.C. at 281, 389 S.E.2d at 56 (citation omitted).

The trial court determined that the evidence should be admitted because the probative value outweighed the potentially prejudicial effect.  The trial court expressly considered that the "evidence [was] not being offered to show that Mr. Pabon acted in conformity with prior acts, [but] that [the] evidence [was] being offered for a limited purpose" and gave the jury an instruction to that effect.  Thus, the trial

court did not abuse its discretion when it admitted the 404(b) evidence over Defendant's objection.

Defendant further asserts that Samonds' testimony was not sufficiently credible to support a finding of Defendant's prior bad acts because the Mecklenburg County District Attorney's Office did not pursue the earlier charge against Defendant. However, this Court has previously stated that a "district attorney's dismissal . . . did not result in defendant's being legally innocent of the prior assault charge" and thus would not preclude evidence from being admissible under Rule 404(b). *State v. Flaugher*, 214 N.C. App. 370, 378, 713 S.E.2d 576, 584 (2011).

For the reasons stated herein, the trial court did not err in when it admitted the State's 404(b) evidence.

III. Confrontation Clause

Defendant alleges the trial court erred in admitting the testimony of Lewallen in violation of the Confrontation Clause. Specifically, Defendant contends that Lewallen failed to provide an independent opinion regarding the testing and analysis of the victim's blood and urine samples because both tests were performed by two non-testifying forensic toxicologists. Defendant also argues he did not have a prior opportunity to cross-examine the non-testifying experts, and that they were not unavailable to testify.

"We review this alleged constitutional error de novo." *State v. Ortiz-Zape*, 367 N.C. 1, 10, 743 S.E.2d 156, 162 (2013). "The Confrontation Clause of the Sixth Amendment bars admission of testimonial evidence unless the declarant is unavailable to testify and the accused has had a prior opportunity to cross-examine the declarant." *State v. Locklear*, 363 N.C. 438, 452, 681 S.E.2d 293, 304 (2009) (citations omitted).

> Our courts have consistently held that an expert witness may testify as to the testing or analysis conducted by another expert if: (i) that information is reasonably relied on by experts in the field in forming their opinions; and (ii) the testifying expert witness independently reviewed the information and reached his or her own conclusion in this case.

*State v. Crumitie,* ___ N.C. App ___, ___, 831 S.E.2d 592, 596 (2019) (citation omitted).

In *Ortiz-Zape*, our Supreme Court stated:

> [W]hen an expert gives an opinion, the expert is the witness whom the defendant has the right to confront. In such cases, the Confrontation Clause is satisfied if the defendant has the opportunity to fully cross-examine the expert witness who testifies against him, allowing the factfinder to understand the basis for the expert's opinion and to determine whether that opinion should be found credible. Accordingly, admission of an expert's independent opinion based on otherwise inadmissible facts or data of a type reasonably relied upon by experts in the particular field does not violate the Confrontation Clause so long as the defendant has the opportunity to cross-examine the expert. We emphasize that the expert must present an independent opinion obtained through his or her own analysis and not merely surrogate testimony parroting otherwise inadmissible statements.

*Ortiz-Zape*, 367 N.C. at 9, 743 S.E.2d at 161-62 (citations and quotation marks omitted).

During direct examination, Lewallen testified to the following:

> [LEWALLEN].   In our immunoassay or our drug screen platform we look for 12 routinely-encountered classes or specific drugs. We're looking for Amphetamine and Methylenedioxyamphetamine. We're looking for Benzodiazepines, which is a class of drugs, looking for opiates, which is also a class of drugs, cocaine metabolite, barbiturates, which is a class of drugs. We're looking for Methadone specific drug, marijuana metabolites, Carisoprodol and Meprobamate, two specific drugs, Methamphetamine and Ectasy, Zolpidem, Tramadol and Oxycodone and Oxymorphone is our standard 12-panel test that we do.
>
> [THE STATE].   And what type of data is produced as a result of this preliminary screening test?
>
> [LEWALLEN].   Once the test is completed, then what happens is we get a print-off of the results of each individual case as to tell us whether or not there is an indication of one of those, having a positive indication one of those particular tests that I just laid out, or it will give a result of negative.
>
> [THE STATE].   Okay. And were you able to review that data that was printed off?
>
> [LEWALLEN].   Yes, ma'am, I was.
>
> [THE STATE].   And were you able to review that data and form your own opinion about what the result of that preliminary screen was?
>
> [LEWALLEN].   Yes, ma'am, I was.

[THE STATE].       And, actually, have you performed this test personally yourself?

[LEWALLEN].       Yes, ma'am, many times.

[THE STATE].       Okay. What opinion did you form about that initial screening test?

[LEWALLEN].       For the blood it was negative for all 12 assays. For the urine we had a positive indication for Amphetamine and Methylenedioxyamphetamine and for Benzodiazepines.

[THE STATE].       Now, when you get a positive like the positive you just described in the urine, what's the next step?

[LEWALLEN].       All cases will proceed for confirmatory testing in which we will do a specific examination to determine what particular drug is present in either the blood or the urine.

[THE STATE].       So did you on this -- on this urine sample from Samantha Forero, did you do the confirmatory analysis test?

[LEWALLEN].       No, ma'am, I did not perform the confirmatory testing on either the blood or the urine sample.

[THE STATE].       Who did?

[LEWALLEN].       That would be Megan Dietz.

[THE STATE].       And what instrument did she use to perform that test?

[LEWALLEN].       She used the GCMS that I referred to earlier.

[THE STATE].     Now, have you ever performed the same test that she performed on that urine sample yourself personally?

[LEWALLEN].     I have performed this test before, but I have not tested that -- that sample.

[THE STATE].     Right. Not that sample, but just performed that test on other samples?

[LEWALLEN].     Yes, ma'am, I've performed this test many times.

[THE STATE].     Okay. You had testified earlier a thousand times; is that fair or . . .

[LEWALLEN].     Yes, ma'am, I can't even count how many times I've performed analysis on the GCMS in my career.

[THE STATE].     Now, are there safeguards to ensure that that GCMS is working properly?

[LEWALLEN].     Yes, ma'am, there are. We have safeguards built into every one of our procedures.

[THE STATE].     What are those safeguards?

[LEWALLEN].     For the GCMS, every day it must pass a performance check in which we analyze a sample of known anolytes. Those anolytes must provide acceptable data. We get two pieces of data from a GCMS. We get a time at which the anolyte comes off of the instrument, and we also get its unique fragmentation pattern. Kind of like – it's kind of like a puzzle, you know. You put a puzzle back together, it can only be put back together one way. That's exactly what we get. We get a chemical fingerprint of this drug, and it is unique to that drug. And so what we do is we compare that to known standards of that drug, and

those have to be identical. And that's one part of our acceptability.

Another part is an internal check that is built into all GCMS's that has to be performed prior to any analysis that is performed. Also, as part of our extraction protocols at the laboratory, we have quality control samples, both positive and negative controls that are extracted in every batch of cases. They are carried through our process through the entirety of it. And when they go to the instrument, those samples are both at the beginning and the end of our analytical batches to show that the instrument is operating property.

In addition to that, prior to any sample being placed on the instrument it must be done so in tandem, and that loading of the instrument must be reviewed by another person to verify that the instrument is loaded properly and all samples were placed in their proper position. And this is then documented and signed off on the -- on the instrument sequence.

Once this is done, all of this data is compiled and is put together in a quality control packet, and that packet is reviewed and made sure that all the data that is required in our policies and procedures is present. And no data, no case data from that run may be used until that QC packet has been reviewed and approved for use.

[THE STATE].    Now, you were able to review the data for this case from the sample from Samantha Forero are (*sic*) right; is that correct?

[LEWALLEN].    Yes, ma'am, I was.

[THE STATE].    So to the best of your ability, was that policy followed, all of those safety checks and controls and all of that, was that properly followed?

[LEWALLEN].    Yes, ma'am, it was.

[THE STATE].    And was the data properly produced as a result of the confirmatory analysis as well as the preliminary screen?

[LEWALLEN].    Yes, ma'am, it was.

[THE STATE].    So was this test performed in accordance with the state crime lab operating procedures?

[LEWALLEN].    Yes, ma'am, it was.

[THE STATE].    And you were able to personally review all of the data that the test produced?

[LEWALLEN].    Yes, ma'am, I was.

[THE STATE].    Okay. Were you able to form an opinion about that test?

[LEWALLEN].    Yes, ma'am, I was.

[THE STATE].    What was the result of that test?

[LEWALLEN].    For the blood, no substances were found present in the blood sample. In the urine sample, 7-aminoclonazepam was detected.

[THE STATE].    And what is 7-aminoclonazepam?

[LEWALLEN].    That is a biological metabolite or breakdown product of Clonazepam which is a Benzodiazepine.

(Defendant's objections and the trial court's rulings omitted).

The record reflects that Lewallen personally reviewed machine generated data from the preliminary immunoassay drug screen and the confirmatory results produced by the GCMS.  He offered his own opinion, without reference to or reliance

upon the opinions or conclusions of the non-testifying technicians. *See State v. Blue*, 207 N.C. App. 267, 281, 699 S.E.2d 661, 670 (2010) (finding no violation of the Confrontation Clause where the expert "was testifying as to his own observations and providing information rationally based on his own perceptions . . . [and did not] testify as to the declarations or findings of anyone other than himself."). Thus, Lewallen's opinion was based on his own analysis and was not merely surrogate testimony for an otherwise inadmissible lab report or signed affidavit certifying the non-testifying technician's results.

Defendant further alleges that he "did not have a prior opportunity to cross-examine the expert who performed the testing and prepared the report." However, "when an expert gives an opinion, the opinion is the substantive evidence and the expert is the witness whom the defendant has the right to confront." *Ortiz-Zape*, 367 N.C. at 12, 743 S.E.2d at 163. Here, Defendant had the opportunity to, and did, question Lewallen extensively on cross-examination.

Because Defendant's Confrontation Clause rights were not violated, the trial court did not err in admitting Lewallen's expert testimony.

IV. Subject Matter Jurisdiction

Defendant contends that the second-degree rape indictment is facially invalid pursuant to N.C. Gen. Stat. § 15-144.1(c) because it failed to state the name of the

victim. Second, Defendant argues the first-degree kidnapping indictment is invalid because it failed to allege all essential elements of the crime. We disagree.

"[W]e review the sufficiency of an indictment *de novo.*" *State v. McKoy*, 196 N.C. App. 650, 652, 675 S.E.2d 406, 409 (2009). "A valid bill of indictment is essential to the jurisdiction of the Superior Court to try an accused for a felony and have the jury determine his guilt or innocence, and to give authority to the court to render a valid judgment." *State v. Marshall,* 188 N.C. App. 744, 748, 656 S.E.2d 709, 712 (2008) (citations and quotation marks omitted).

Defendant asserts that the use of the victim's initials in the indictment was insufficient. However, N.C. Gen. Stat. § 15-144.1(c) states:

> If the victim is a person who has a mental disability or who is mentally incapacitated or physically helpless, it is sufficient to allege that the defendant unlawfully, willfully, and feloniously did carnally know and abuse a person who had a mental disability or who was mentally incapacitated or physically helpless, naming the victim, and concluding as required by law. Any bill of indictment containing the averments and allegations named in this section is good and sufficient in law for the rape of a person who has a mental disability or who is mentally incapacitated or physically helpless and all lesser included offenses.

N.C. Gen. Stat. § 15-144.1(c) (2019).

Defendant further argues that use of the victim's initials is impermissible pursuant to *State v. White,* 372 N.C. 248, 827 S.E.2d 80 (2019). In *White*, the North Carolina Supreme Court held that using "Victim #1" in the indictment was insufficient to "name the victim." *Id.* at 252, 827 S.E.2d at 83. "[T]o name someone

is to identify that person in a way that is unique to that individual and enables others to distinguish between the named person and all other people. The phrase 'Victim #1' does not distinguish this victim from other children or victims." *Id.* at 252, 827 S.E.2d at 83.

However,

> [w]here the statutes defining second-degree rape and second-degree sexual offense require the offenses to be against "another person," the indictments charging these offenses do not need to state the victim's full name, nor do they need to add periods after each letter in initials in order to accomplish the common sense understanding that initials represent a person.

*McKoy*, 196 N.C. App. at 654, 675 S.E.2d at 409-10. *White* is not applicable here. Use of the victim's initials sufficiently "identif[ies] [the victim] in a way that is unique to that individual and enables others to distinguish between the named person and all other people." *White,* 372 N.C at 252, 827 S.E.2d at 82. There is nothing in *White* which overturned "the common sense understanding that initials represent a person." *McKoy*, 196 N.C. App. at 654, 675 S.E.2d at 410. Consistent with *McKoy*, it is unnecessary to include the victim's full name. Therefore, the use of the victim's initials is proper.

Defendant also argues that the first-degree kidnapping indictment is invalid because it did not allege or specify what crime constituted the underlying "sexual assault." This argument is without merit. Although Defendant asserts that the indictment must have alleged and specified the sexual assault element of first-degree

kidnapping in order to be valid, our courts have never imposed such a requirement. *See State v. Freeman*, 314 N.C. 432, 434-35, 333 S.E.2d 743, 745 (1985) (holding that the indictment need not specify the underlying felony intended to be committed in elevating the kidnapping charge to first-degree kidnapping to be valid); *State v. Byers*, 175 N.C. App. 280, 623 S.E.2d 357 (2006) (holding that a burglary indictment need not identify the felony intended to be committed to be valid).

"[T]he purposes of an indictment include giving a defendant notice of the charge against him so that he may prepare his defense and be in a position to plead prior jeopardy if he is again brought to trial for the same offense." *Freeman*, 314 N.C. at 435, 333 S.E.2d at 745.

Because the indictments at issue here properly identified the victim and gave Defendant notice of the charges against him, both indictments were valid. Therefore, the trial court had jurisdiction over the matters.

V. Jury Instructions

Defendant alleges the trial court committed plain error when it failed to instruct the jury that the evidence presented to prove an element of the offenses could not be used to also prove the aggravating factor. Specifically, Defendant contends that the totality of the State's evidence presented to demonstrate Defendant's violation of a position of trust, was identical to the evidence necessary to prove the essential element of intent for both charges. Defendant argues that the trial court's

failure to properly instruct the jury had a probable impact on the jury finding the aggravating factors. We disagree.

"Failure to make an appropriate and timely motion or objection constitutes a waiver of the right to assert the alleged error upon appeal[.]" N.C. Gen. Stat. § 15A-1446(b) (2019). Our Courts have "elect[ed] to review such unpreserved issues for plain error . . . when they involve . . . errors in the judge's instructions to the jury[.]" *State v. Gregory*, 342 N.C. 580, 584, 467 S.E.2d 28, 31 (1996) (citations omitted).

"To have an alleged error reviewed under the plain error standard, the defendant must 'specifically and distinctly' contend that the alleged error constitutes plain error." *State v. Lawrence*, 365 N.C. 506, 516, 723 S.E.2d 326, 333 (2012) (citations omitted). Here, Defendant concedes that he did not object to the jury instruction at trial, and argues the trial court committed plain error when it failed to properly instruct the jury.

In order to establish plain error, a defendant bears the burden of demonstrating that a fundamental error occurred at trial. *Id.* at 518, 723 S.E.2d at 334. For an error to be fundamental, "a defendant must establish prejudice—that, after examination of the entire record, the error had a probable impact on the jury's finding that the defendant was guilty." *Id.* at 518, 723 S.E.2d at 334 (citation and quotation marks omitted).

At trial, the court provided the following jury instruction:

> Do you find from the evidence beyond a reasonable doubt the existence of the following aggravating factor: The defendant took advantage of a position of trust or confidence to commit the offense? . . . . You should consider all the evidence, the arguments, contentions and positions urged by the attorneys and any other contention that arises from the evidence.

The trial court's instruction indicated the jury "should consider all the evidence." However, pursuant to N.C. Gen. Stat. § 15A-1340.16(d), "[e]vidence necessary to prove an element of the offense shall not be used to prove any factor in aggravation, and the same item of evidence shall not be used to prove more than one factor in aggravation." N.C. Gen. Stat. § 15A-1340.16(d) (2019). "Because N.C. Gen. Stat. § 15A-1340.16(d) limits what evidence the jury can consider in deciding whether an aggravating factor exists, the trial court was required to instruct the jury in accordance with the statute—as the pattern jury instruction specifies." *State v. Barrow*, 216 N.C. App. 436, 446, 718 S.E.2d 673, 679 (2011). Here, the trial court erroneously failed to provide a limiting instruction as to the aggravating factor because the trial court instructed the jury that it could consider all of the evidence when deliberating and deciding the aggravating factor.

While the trial court's instruction was in error, Defendant must demonstrate "a reasonable possibility that had the instruction been given, the jury would have failed to find the existence of the aggravating factors." *Id.* at 446, 718 S.E.2d at 679. *See* N.C. Gen. Stat. § 15A-1443(a) (2019).

The jury shall not use "[e]vidence necessary to prove an element of the offense . . . to prove any factor in aggravation." N.C. Gen. Stat. § 15A-1340.16(d). Defendant alleges that the State's evidence tending to show a violation of a position of trust was identical to the evidence necessary to prove intent to commit second-degree forcible rape and first-degree kidnapping. However, violation of a position of trust is not an element of either first-degree kidnapping or second-degree forcible rape. Accordingly, evidence used to prove the aggravating factor was not necessary to prove that Defendant intended to commit second-degree forcible rape or first-degree kidnapping. Therefore, Defendant did not demonstrate that there was a reasonable possibility that the instructional error had an impact on the jury's verdict. Thus, Defendant was not prejudiced by the jury instruction.

## VI. SBM

Defendant's last argument on appeal is that the trial court erred when it overruled his objection to imposition of SBM for life. However, other than listing this argument in the index, Defendant does not argue this issue in the body of his brief.

"Issues not presented in a party's brief, or in support of which no reason or argument is stated, will be taken as abandoned." N.C. R. App. P. 28(b)(6). Furthermore, "[i]t is not the duty of this Court to supplement an appellant's brief with legal authority or arguments not contained therein." *Goodson v. P.H. Glatfelter*

*Co.*, 171 N.C. App. 596, 606, 615 S.E.2d 350, 358 (2005); N.C. R. App. P. 28. Defendant has abandoned this argument.

<u>Conclusion</u>

For the foregoing reasons, we find that Defendant received a fair trial free of prejudicial error.

NO PREJUDICIAL ERROR.

Judge BRYANT concurs.

Judge MURPHY dissents in separate opinion.

MURPHY, Judge, dissenting in part and concurring in part.

Defendant argues the trial court erred in overruling Defendant's Confrontation Clause objections to the testimony of Frank Lewallen, a regional forensic scientist manager for the State Crime Lab, regarding the tests performed by a non-testifying chemical analyst. Defendant states it is

> undisputed that Lewallen . . . did not perform the testing or analysis that produced this result, that the expert who performed the testing and prepared the report was not unavailable to testify, and that Defendant did not have a prior opportunity to cross-examine the expert who performed the testing and prepared the report.

Defendant contends on appeal Lewallen failed to provide an independent opinion regarding the testing and analysis of the victim's blood and urine samples because both tests were performed by two non-testifying forensic toxicologists. I cannot join the Majority in holding "Lewallen's opinion was based on his own analysis and was not merely surrogate testimony for an otherwise inadmissible lab report or signed affidavit certifying the non-testifying technician's results." *Supra* at 31. Therefore, I respectfully dissent in part.

Rule 702(a) provides that an expert witness may testify "in the *form of an opinion*" if "scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue." N.C.G.S. § 8C-1, Rule 702(a) (2019) (emphasis added). "[T]he expert must present an independent opinion obtained through his or her own analysis and not merely 'surrogate testimony'

parroting otherwise inadmissible statements." *State v. Ortiz-Zape*, 367 N.C. 1, 9, 743 S.E.2d 156, 162 (2013).

In *Bullcoming v. New Mexico*, the United States Supreme Court decided "whether the Confrontation Clause permits the prosecution to introduce a forensic laboratory report containing a testimonial certification—made for the purpose of proving a particular fact—through the in-court testimony of a scientist who did not sign the certification or perform or observe the test reported in the certification." *Bullcoming v. New Mexico*, 564 U.S. 647, 652, 180 L. Ed. 2d 610, 616 (2011). The Court held "surrogate testimony of that order does not meet the constitutional requirement. The accused's right is to be confronted with the analyst who made the certification, unless that analyst is unavailable at trial, and the accused had an opportunity, pretrial, to cross-examine that particular scientist." *Id.*

Our Supreme Court followed the *Bullcoming* holding in *State v. Craven*, ordering a new trial where a lab report was improperly admitted into evidence after a State Bureau of Investigation analyst testified about the content of lab reports that the analyst did not create. *State v. Craven*, 367 N.C. 51, 744 S.E.2d 458 (2013). The prosecutor asked:

> Q. Now did you also bring with you notes and documentation for the date of offense March 3, 2008?
>
> A. I did.
>
> Q. And who—who completed that analysis?

A. Mr. Tom Shoopman completed that analysis.

….

Q. And did you bring his report?

A. I did.

Q. Did you have a chance to review it?

A. I have.

Q. Do you agree with its conclusions?

A. I do.

….

Q. What was Mr. Shoopman's conclusion?

[Objection by defense counsel]

….

A. According to the lab report prepared by Tom Shoopman, the results for State's Exhibit Number . . . . 10 were cocaine base schedule two controlled substance with a weight of 1.4 grams.

The lab report then was admitted into evidence.

Similarly, regarding the 6 March 2008 sample, the State asked:

Q. Now turning to State's Exhibit Number 12 and offense date March 6th of 2008, did you bring a report from the SBI regarding that date of offense?

A. I did.

3

Q. Who conducted that analysis?

A. Mr. Irvin Allcox.

Q. And do you have that report in your hand?

A. I do.

Q. And do you have the underlying data supporting that conclusion?

A. I do.

Q. And you do agree with the conclusion stated in that report?

A. I do.

....

Q. And what conclusion did [Mr. Allcox] reach?

[Objection by defense counsel]

A. The item . . . . twelve was cocaine base, schedule two controlled substance. And it had a weight of 2.5 grams.

*Id.* at 55-56, 744 S.E.2d at 461 (emphasis omitted). The testimony was not an independent opinion obtained through the analyst's own analysis. Our Supreme Court in *Craven* held the analyst "did not offer—or even purport to offer—her own independent analysis or opinion on the . . . samples. Instead, [she] merely parroted [the testing agent's] conclusions from their lab reports." *Id.* at 56-57, 744 S.E.2d at 461.

*Murphy, J., dissenting in part and concurring in part.*

Further, in *Ortiz-Zape*, related testimony was offered by a testifying analyst, but "the reports produced by the non-testifying analyst were not admitted into evidence." *Ortiz-Zape*, 367 N.C. at 11, 743 S.E.2d at 163. In *Ortiz-Zape*, however, "the prosecutor established that [the testifying analyst's] opinion was her own, independently reasoned opinion—not 'surrogate testimony' parroting the testing analyst's opinion." *Id.* at 12, 743 S.E.2d at 163. The prosecutor in *Ortiz-Zape* asked:

> Q. Based on your training and experience in the field of forensic chemistry and your employment at the CMPD crime lab as well as other labs prior to that and your review of the file in this case, did you have a chance to form your own independent expert opinion as to the identity of the substance in control number 16826?
>
> A. Yes, I did.
>
> Q. What is your independent expert opinion?
>
> [DEFENSE COUNSEL]: Objection, your Honor. I don't need to be heard further.
>
> THE COURT: Yes, ma'am. Objection overruled, you may answer.
>
> A. My conclusion was that the substance was cocaine.
>
> Q. Is that still your opinion currently?
>
> A. Yes, it is.

*Id.* at 11, 743 S.E.2d at 163. The defendant argued this expert opinion was inadmissible because the expert "did not personally test or observe [the substance] being tested [which] violated his right to confront witnesses against him." *Id.* at 12,

743 S.E.2d at 163. Our Supreme Court held the expert gave *her opinion* that was "based upon facts or data of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject." *Id.* (internal quotations omitted). Our Supreme Court further concluded "[t]his expert opinion, from [the testifying analyst's] own analysis of the data, constituted the substantive evidence being presented against [the] defendant[,] . . . [and the d]efendant was able to cross-examine" the testifying analyst. *Id.* at 13, 743 S.E.2d at 164 (internal citations omitted).

The proffered testimony from *Craven* is almost identical in nature to the testimony here. Lewallen's testimony is not substantially similar to that of *Ortiz-Zape* and is more similar to the testimony in *Craven* that was not admissible. Lewallen simply parroted the conclusions of a test performed by another person not subject to the confrontation required by the United States Constitution.

The State only asked Lewallen "[w]ere you able to form an opinion about that test?" Lewallen did not actually offer an opinion as to what the substance was. The State followed up that question with, "[w]hat was the result of that test?" To that question, Lewallen parroted the results of the test he did not perform, and stated "[f]or the blood, no substances were found present in the blood sample. In the urine sample, 7-aminoclonazepam was detected." Lewallen's testimony was not his independent opinion satisfying Rule 702 safeguards. Our Supreme Court found

similar statements to be inadmissible in *Craven* when the prosecutor asked the expert about the "conclusion" of the test results, to which the expert responded "[a]ccording to the lab report prepared by [the other expert], the results for State's Exhibit Number . . . . 10 were cocaine base schedule two controlled substance with a weight of 1.4 grams." *Craven*, 367 N.C. at 56, 744 S.E.2d at 461.

Unlike in *Ortiz-Zape*, where the expert gave an "independent expert opinion," *Ortiz-Zape*, 367 N.C. at 11, 743 S.E.2d at 163, Lewallen provided surrogate testimony on an otherwise inadmissible lab report. Lewallen did not provide testimony in the form of an opinion and did not present an independent opinion through his own analysis. "Dispensing with confrontation because testimony is obviously reliable is akin to dispensing with jury trial because a defendant is obviously guilty. This is not what the Sixth Amendment prescribes." *Crawford v. Washington*, 541 U.S. 36, 62, 158 L. Ed. 2d 177 (2004). Lewallen's testimony was inadmissible and Defendant is entitled to a new trial free from this prejudicial violation of his constitutional rights. I respectfully dissent in part.

I concur in the Majority as to Parts I, II, and IV, but would hold Parts V and VI to be moot in light of my dissenting opinion as to Part III.