BRYANT, Judge.
 

 *374
 
 Where an identification by a law enforcement officer was not subject to the Eyewitness Identification Reform Act, we affirm the trial court's denial of defendant's motion to suppress. Where defendant was given an opportunity to cross-examine testifying expert witness about another expert's report, the trial court did not err in allowing the testimony into evidence.
 

 In the early evening of 5 August 2016, defendant Timothy Lavaun Crumitie went to the apartment complex of his ex-girlfriend, Kimberly Cherry, and shot her boyfriend, Michael Gretsinger, twice in the head. Defendant abducted Cherry and took her to his house in Rowan County. He eventually took her back to a field near her apartment complex, shot her twice in the head, and dumped her in the trunk of the car. Cherry survived and escaped to call the police. Cherry had difficulty speaking, due to the bullets in her head causing hemorrhaging and trauma to the area that controls speech. After speaking with the police, Cherry was transported to the hospital and admitted to the intensive care unit. Gretsinger was rushed to the hospital for surgery. Although the surgery stabilized
 
 *375
 
 Gretsinger, the doctors could not remove the bullets as they had passed through to the other side of his brain, and Gretsinger died nine days later.
 

 Defendant was indicted on one count of attempted first-degree murder of Cherry, one count of attempted first-degree murder of Gretsinger, one count of possession of a firearm by a felon, one count of first-degree kidnapping, and one count of assault on a female. After Gretsinger was pronounced dead, defendant was indicted for murder and one count of first-degree burglary. The State did not seek the death penalty. Defendant filed a pre-trial motion to suppress identification testimony by Officer Bradley Potter of the Charlotte-Mecklenburg Police Department, who responded to Cherry's 911 call and observed defendant near Cherry's apartment.
 

 The case was tried on 5 February 2018 in Mecklenburg County Superior Court before the Honorable Hugh B. Lewis, Judge presiding. Defendant filed a pre-trial motion to suppress and a hearing was held.
 

 Officer Potter testified that he saw a man at Cherry's apartment when he responded to a shooting incident at her residence. The man ran into the breezeway of an adjacent building, and Officer Potter ran after him. Officer Potter testified that he thought, from
 
 *594
 
 the towel in the man's hands, the man was running to render aid to a gunshot victim. After he lost sight of the man, Officer Potter went to try and locate Cherry, who had sought refuge with people in another apartment. Cherry told Officer Potter that her boyfriend had been shot and described the suspect as a black male, fifty years old, and approximately 5'9? in height. Because Cherry was having difficulty communicating verbally, Officer Potter asked her to write down what she needed to tell him on his notepad. She wrote down defendant's name and her apartment number where officers soon found Gretsinger. Officer Potter accessed a DMV photograph of defendant, whom he identified as the same man he had seen running with a towel when he arrived at the scene. The trial court denied defendant's suppression motion and allowed Officer Potter to testify before the jury. At trial, the State called Officer Potter to testify about Cherry's 911 call, and over defendant's objections, the trial court allowed his testimony identifying defendant.
 

 Special Agent Michael Sutton of the FBI's Cellular Analysis Survey Team ("CAST") was called to testify for the State as an expert in the field of historical cellular site analysis and cellular technology. Special Agent Warren, the FBI agent who analyzed the cellphone records of defendant and Cherry, was unavailable to testify at trial. The State moved to introduce Agent Warren's cell site analysis report through Agent Sutton. Defendant objected arguing the State had committed discovery
 
 *376
 
 violations and that admission of the report would violate defendant's right to confront witnesses against him. The trial court excluded Agent Warren's report but allowed Agent Sutton to testify about the procedures of CAST, his review of the report, and his independent opinion about the testing.
 

 Defendant was convicted
 
 [1]
 
 of first-degree murder of Gretsinger, first-degree kidnapping and attempted first-degree murder of Cherry, second-degree burglary, and possession of a firearm by a felon. The jury found defendant not guilty of assault on a female. Defendant received a mandatory life sentence for first-degree murder and separate sentences for the other convictions. Defendant gave notice of appeal in open court.
 

 _________________________
 

 On appeal, defendant argues the trial court erred by: I) denying his motion to suppress eyewitness identification testimony, and II) allowing an expert witness to testify regarding a report created by an unavailable witness.
 

 I
 

 Defendant first argues the trial court improperly denied his motion to suppress Officer Potter's eyewitness testimony. Specifically, defendant argues that Officer Potter failed to comply with "show-up" procedures, as set forth in the Eyewitness Identification Reform Act ("EIRA"). We disagree.
 

 Our review of a trial court's denial of a motion to suppress is "strictly limited to determining whether the trial judge's underlying findings of fact are supported by competent evidence, in which event they are conclusively binding on appeal, and whether those factual findings[,] in turn[,] support the judge's ultimate conclusions of law."
 
 State v. Cooke
 
 ,
 
 306 N.C. 132
 
 , 134,
 
 291 S.E.2d 618
 
 , 619 (1982). "Conclusions of law are reviewed
 
 de novo
 
 and are subject to full review."
 
 State v. Biber
 
 ,
 
 365 N.C. 162
 
 , 168,
 
 712 S.E.2d 874
 
 , 878 (2011).
 

 The EIRA, codified in N.C. Gen. Stat. § 15A-284.52, establishes standard procedures for law enforcement officers when conducting out-of-court eyewitness identifications of suspects. N.C. Gen. Stat. § 15A-284.52 (2017). There are three types of eyewitness identifications under the EIRA to identify the perpetrator of a crime: live lineups, photo lineups, and show-ups. Live lineups are "procedure[s] in which a group
 
 *377
 
 of people [are] displayed to an eyewitness[,]" whereas photo lineups are "procedure[s] in which an array of photographs [are] displayed to an eyewitness[.]"
 
 Id
 
 . § 15A-284.52(a)(6)-(7). Show-ups are "procedure[s] in which an eyewitness is presented with a
 
 *595
 
 single live suspect for the purpose of determining whether the eyewitness is able to identify the perpetrator of a crime."
 
 Id
 
 . § 15A-284.52(a)(8).
 

 Here, the inadvertent out-of-court identification of defendant, based on a single DMV photograph accessed by an investigating officer, was neither a lineup or show-up under the EIRA, and thus not subject to those statutory procedures.
 

 At the hearing, the trial court made the following factual findings:
 

 We have an officer arriving on the scene having been dispatched for a high priority call. He is on full alert. He is going into a well[-]lit area, his eyesight is 20/20 with his contacts which he was wearing that evening. He saw an individual running with a towel approximately sixty yards or fifty yards away from him. That'll be about 160 feet, 175 feet.
 

 He believes that individual was actually proceeding to the location where the injured individual may need to provide aid, and follows that individual and loses sight of him in the breeze way [sic]. Eventually[,] the officer, along with other officers, come across the victim who was allegedly shot twice in the head. They began looking for another victim, who then provided the information of names.
 

 The officer proceeds to continue his investigation using an electronic database in his patrol car, which includes identification photographs of individuals that are in that database. When he brings up the defendant's name, a picture comes up as well. It's after that point he connects the identity of the defendant with the person he saw in the parking lot.
 

 That officer is doing good police work and investigating a crime scene which is part of his official capacity. Therefore, I believe that as to the photograph itself, that the statement in
 
 Macon
 
 where the court indicated that they did not believe the legislature intended to prevent police officers from consulting a photograph in a database to follow up on leads that are given by other officers, or in this case also a
 
 *378
 
 victim. And they upheld the court's decision that the EIRA did not apply here.
 

 Upon review of Officer Potter's testimony, we agree with the trial court that the EIRA does not apply to his identification of defendant. Officer Potter testified in detail that when he arrived at Cherry's apartment complex, he saw a black male, wearing a green t-shirt, and carrying a white towel approximately 60 yards away. Officer Potter interviewed Cherry, who issued a detailed statement and description of the suspect--she identified defendant by name and age. That information--defendant's name, physical description, and date of birth--was used by Officer Potter to locate registered vehicles for the purposes of issuing a BOLO. As Officer Potter searched through the CJLeads database, defendant's DMV photograph appeared and Officer Potter learned for the first time that defendant was the man he saw when he arrived at Cherry's apartment complex. Officer Potter testified that he was "100 percent" certain he could identify the man even if defendant's DMV photograph was suppressed as evidence.
 

 Even assuming Officer Potter's viewing of defendant's DMV photograph was somehow inherently suggestive, defendant has not demonstrated that, under the totality of the circumstances, there was a substantial likelihood of irreparable misidentification.
 
 See
 

 State v. Harris
 
 ,
 
 308 N.C. 159
 
 , 162,
 
 301 S.E.2d 91
 
 , 94 (1983) ("Identification evidence must be excluded as violating a defendant's right to due process where the facts reveal a pretrial identification procedure so impermissibly suggestive that there is a very substantial likelihood of irreparable misidentification.").
 

 The factors to be considered in evaluating the likelihood of irreparable misidentification include: (1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness's degree of attention; (3) the accuracy of the witness's prior description of the criminal; (4) the level of certainty demonstrated by the witness at the confrontation; and (5) the length of time between the crime and the confrontation.
 

 Id
 
 . at 164,
 
 301 S.E.2d at 95
 
 .
 

 Officer Potter responded to a high-priority dispatch to investigate a crime. He
 
 *596
 
 was in a well-lit area, had clear 20/20 vision with contacts, and a clear, unobstructed view of a man running about "sixty yards or fifty yards away from him." He was able to see a man, wearing a green shirt, and carrying a white towel. Prior to viewing defendant's photograph,
 
 *379
 
 Officer Potter did not give a description of the man as he was not a suspect at that time. In fact, Officer Potter testified with "100 percent" certainty that he could identify the man as it was an "instantaneous reaction" upon seeing the photograph. Further, the length of time between Officer Potter seeing defendant in person and seeing his DMV photograph in CJLeads was less than an hour.
 

 Based on the circumstances, there is neither evidence that viewing the photograph was inherently suggestive or that Officer Potter's viewing of the photograph created a substantial likelihood of irreparable misidentification. Officer Potter's identification at the scene was clearly independent of his viewing of defendant's photograph, and thus, there was no error by the trial court in admitting his testimony.
 
 See
 

 State v. Macon
 
 ,
 
 236 N.C. App. 182
 
 , 191,
 
 762 S.E.2d 378
 
 , 383 (2014) (holding that an officer's identification of a suspect would be admissible if the identification "had an origin independent of the impermissible procedure.").
 

 II
 

 Defendant also argues the trial court erred by allowing Agent Sutton to testify as an expert witness, and refer to the report of Agent Warren, who was unavailable to testify. Specifically, defendant contends the trial court violated his constitutional right to confront his witness.
 
 [2]
 
 We disagree.
 

 Our courts have consistently held that an expert witness may testify as to the testing or analysis conducted by another expert if: (i) that information is reasonably relied on by experts in the field in forming their opinions; and (ii) the testifying expert witness independently reviewed the information and reached his or her own conclusion in this case.
 
 See
 

 State v. Brewington
 
 ,
 
 367 N.C. 29
 
 , 32,
 
 743 S.E.2d 626
 
 , 628 (2013) (holding that the defendant's rights were not violated when testifying witness gave an opinion based on her own analysis of a lab report prepared by another analyst);
 
 see also
 

 State v. Ortiz-Zape
 
 ,
 
 367 N.C. 1
 
 , 9,
 
 743 S.E.2d 156
 
 , 161 (2013) (holding that Confrontation Clause was not violated by the admission of expert's independent opinion based on testing that was conducted by another analyst). Our Supreme Court in
 
 State v. Ortiz-Zape
 
 stated:
 

 *380
 
 [W]hen an expert gives an opinion, the expert is the witness whom the defendant has the right to confront. In such cases, the Confrontation Clause is satisfied if the defendant has the opportunity to fully cross-examine the expert witness who testifies against him, allowing the factfinder to understand the basis for the expert's opinion and to determine whether that opinion should be found credible. Accordingly, admission of an expert's independent opinion based on otherwise inadmissible facts or data of a type reasonably relied upon by experts in the particular field does not violate the Confrontation Clause so long as the defendant has the opportunity to cross-examine the expert.
 

 367 N.C. at 9, 743 S.E.2d at 161 (internal citation and quotation marks omitted).
 

 Here, Special Agent Warren, who was unavailable to testify, had performed a cell site analysis and created a report of the data. The State called Agent Sutton, an expert in the field of historical cell site analysis and cellular technology, and he was tendered as an expert without objection from defendant. During his direct examination, Agent Sutton testified about the procedures in cell site analysis:
 

 [PROSECUTOR]: Can you tell the jury how a peer review is completed?
 

 *597
 
 [AGENT SUTTON]: With all of our cases when the CAST expert conducts an analysis, before we put the final stamp of approval on that, a second expert has to review that information and concur. So a completely independent analysis of the call detail records and the ultimate conclusions has to be done. And then at that point[,] the report is submitted as final.
 

 [PROSECUTOR]: Were you asked to review [Agent Warren's] cell phone analysis for this case?
 

 [AGENT SUTTON]: Yes.
 

 [PROSECUTOR]: Did you do that?
 

 [AGENT SUTTON]: I did.
 

 [PROSECUTOR]: And did you independently check the information in his cell site analysis to verify that it is correct and accurate?
 

 *381
 
 [AGENT SUTTON]: I did.
 

 [PROSECUTOR]: Is it correct and accurate?
 

 [AGENT SUTTON]: It is.
 

 [PROSECUTOR]: Is it fair to say that you essentially did another peer review on it?
 

 [AGENT SUTTON]: That is exactly what I did.
 

 [PROSECUTOR]: Is [sic] your analysis and conclusions the same as Special Agent Warren's?
 

 [AGENT SUTTON]: They are.
 

 Defendant's argument that the admission of Agent Sutton's testimony regarding Agent Warren's report violated his constitutional right to confront his witness is without merit. The record supports that Agent Sutton gave his independent opinion about the process of reviewing cellphone data recorded by network carriers and utilizing cellphone towers to determine the location of defendant's phone in relation to Cherry's apartment around the time of the incident. His testimony provided insight as to the practice of cell site analysis and the peer review process, which he used to formulate his independent opinion separate from that of Agent Warren prior to the submission of the final report. It is also clear from the record that defendant was given ample opportunity to cross-examine Agent Sutton as to the report created by Agent Warren as well as Agent Sutton's own independent expert opinion. Accordingly, the trial court did not err in admitting Agent Sutton's testimony.
 

 NO ERROR.
 

 Judges STROUD and COLLINS concur.
 

 [1]
 

 The attempted first-degree murder of Gretsinger was dismissed and the first-degree burglary indictment was later amended to second-degree burglary.
 

 [2]
 

 Defendant also contends that because he was not provided an expert report from Agent Sutton, he was unable to effectively cross-examine him. Defendant was given prior notice that Agent Sutton would testify in place of Agent Warren and he was given an opportunity to use Agent Warren's report during cross-examination of Agent Sutton to challenge the underlying basis of his opinion. Thus, we reject defendant's contention of a potential discovery violation as it is without merit.