IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA 22-1029

Filed 16 January 2024

Macon County, Nos. 19 CRS 50650-51

STATE OF NORTH CAROLINA

v.

JOSEPH BALL

Appeal by Defendant from judgment entered 17 December 2021 by Judge William H. Coward in Macon County Superior Court. Heard in the Court of Appeals 20 September 2023.

> *Attorney General Joshua H. Stein, by Assistant Attorney General Ryan C. Zellar, for the State.*
>
> *Joseph P. Lattimore, for the Defendant-Appellant.*

WOOD, Judge.

Joseph Ball ("Defendant") appeals from judgments entered by the trial court after a jury verdict finding him guilty of second-degree forcible rape, first-degree burglary, interfering with an emergency communication, second-degree kidnapping, and assault on a female. For the reasons stated below, we hold Defendant received a fair trial, free from error.

## I. Factual and Procedural Background

On the evening of 11 May 2019, Defendant appeared at the residence of K.V.[1] K.V.'s residence is situated on a seventeen-acre farm and contains her primary residence, a storage building, and a guest house. Defendant and K.V. knew each other previously as they had worked together at a Christmas tree lot in Atlanta, Georgia and Defendant had completed carpentry work at her property years earlier.

When K.V. answered the door, Defendant informed K.V. his car was stuck in a nearby ditch, and he could not drive it. K.V. offered Defendant her guest house for the night, walked him to the structure, and returned to her residence. K.V. texted two friends notifying them that a person was staying in her guest house and asked them to check in with her in the morning because she felt uncomfortable.

At trial, the parties offered different accounts of what followed. K.V. testified that after she returned to her home, Defendant came to her front door again and asked for a cigarette lighter. After she handed a lighter to Defendant, he barged through the front door into the home. K.V. ran to retrieve her phone to call for help, but before she could reach her phone, Defendant "intercepted [her] and threw [her] on the bed." K.V. landed on her bed face down.

Defendant jumped on the bed, placed his knee in K.V.'s back, grabbed her wrists, and attempted to roll her over. K.V. began to scream, kick, and repeatedly ordered Defendant to leave her home. When Defendant ignored her, K.V. began to

---

[1] The prosecuting witness is referred to by her initials to protect her identity.

beg Defendant not to hurt her and told him she would not call the police if he left her home without hurting her. According to K.V., Defendant responded "I've made it this far, I'm going to finish it." K.V. testified she warned Defendant that "if he did finish it, there would be consequences that he might not like" to which Defendant responded, "I don't care what the consequences are." Defendant moved K.V. onto her back, at which point she kicked Defendant in the face, causing his glasses to fly off his face. At some point during the struggle, K.V. noticed Defendant's cell phone on the bed, picked it up, and attempted to dial 911. However, before she could complete the call, Defendant grabbed the phone out of K.V.'s hands and threw it against the wall.

K.V. testified that during this struggle, she feared for her life as she, a sixty-five-year-old woman, measuring 5'1", and weighing 140 pounds, was resisting a man likely around forty years old, measuring around 6'1", and weighing around 250 to 300 pounds. Recounting the struggle, K.V. testified:

> [I]t became pretty clear to me that my choice was to submit or die. I think every woman at some point in their life has imagined what they would do if they were put in this circumstance. And I simply knew I needed to submit so that I could live, so I let him roll me over.

Once K.V. was rolled onto her back, Defendant attempted to vaginally penetrate her but was unable to do so. Defendant then grabbed K.V.'s hair, pushed her face into his crotch, and demanded oral sex. K.V. refused. Defendant eventually penetrated K.V.'s vagina with his penis.

After Defendant ejaculated, he rolled off her, and she quickly leapt off the bed, attempting to escape. As she was running from her bedroom, Defendant, while still lying on the bed, grabbed and ripped off K.V.'s nightgown. K.V. escaped out of her front door nude, grabbed a blanket from the guest house to cover herself, and ran to her neighbor's home to ask for help. After failing to obtain help from her neighbors, K.V. approached a nearby sheriff's vehicle for assistance and reported that she had been raped by a man who was still in her home. The officers accompanied K.V. back to her home and found Defendant asleep on the bed. Defendant did not respond to the officers. The officers rolled him onto his side to handcuff him and removed him from K.V.'s home. K.V. underwent a sexual assault nurse examination ("SANE exam") the following morning on 12 May 2019.

In Defendant's recount of the night in question, he testified he was on his way to Atlanta but realized he was too intoxicated from alcohol to drive and needed to rest before continuing his travels. Defendant testified he had several drinks over the course of the day and by the evening began to "fade in and out of consciousness" after consuming six "Long Island iced teas" at a restaurant. Remembering K.V. lived near the travel route he was planning to take, Defendant decided to try to stay with her until he became sober. According to Defendant, after K.V. agreed to let him stay in her guest house, the two later went into K.V.'s bedroom, where he caressed and kissed K.V.'s breasts while they were lying together on the bed. Defendant testified he initially could not perform sexually, so he had to "manually stimulate" himself. He

testified that he and K.V. eventually engaged in consensual sexual intercourse.

On 15 July 2019, Defendant was charged with second-degree forcible rape, first-degree burglary, and interfering with an emergency communication. On 22 January 2020, Defendant was charged with second-degree kidnapping, sexual battery, and assault on a female in a superseding indictment. Defendant's trial was held during the 13 December 2021 criminal session of the Macon County Superior Court.

In addition to the testimony presented by K.V., the State presented the testimony of Corporal Lynch of the Macon County Sheriff's Department, who accompanied K.V. back to her home. Corporal Lynch testified that when he entered K.V.'s home, he found "a large naked man in the bed." Corporal Lynch noted, "he's way over 6 foot tall, I would estimate; and he was in excess of 200 pounds, probably 250 pounds. He was much larger than I was and much larger than [K.V]." Corporal Lynch placed Defendant under arrest, handcuffed him and rolled him onto his side because he was vomiting. Corporal Lynch testified there was a strong odor of alcohol and opined that Defendant was "appreciably intoxicated."

The State also called Detective Wright of the Macon County Sheriff's Office Special Victim's Unit who testified to taking pictures and collecting evidence at K.V.'s home as part of her normal investigation practice. Some of the pictures and evidence collected were accepted into evidence at trial and included a photograph of Defendant lying on K.V.'s bed, men's clothing, boots and boxer shorts, a broken cell phone with

a cell phone battery, a cigarette butt, a photograph of metal framed eyeglasses on the floor, and a photograph of a torn nightgown on K.V.'s bed.

The State called as a witness Mr. Wendell Ivory of the North Carolina State Crime Lab who reviewed Defendant's DNA samples as well as DNA samples obtained through vaginal swabs of K.V. Mr. Ivory testified "[t]he major DNA profile matches the DNA profile from [Defendant]," while "the minor profile is no different from that of [K.V.]."

The State called Nurse Maillet, a forensic nursing supervisor at Mission Hospital, who was tendered at trial, without objection, as an expert in sexual assault nurse examinations. Nurse Maillet provided expert testimony regarding the SANE exam report, which was performed by Nurse Sullivan, a registered nurse at Mission Hospital, on 12 May 2019.

Nurse Maillet testified she personally reviewed K.V.'s SANE exam report and concluded the examination was conducted in accordance with the proper protocols governing all sexual assault examinations. Nurse Maillet further explained that part of the general protocol governing all sexual assault examinations is for the examining nurse to take photographs of nearly every part of the patient's body. Nurse Maillet personally reviewed the photographs taken during K.V.'s examination, and she observed bruising, abrasions and redness in the photographs that were "consistent with blunt trauma, which is what happens during a sexual assault." In connection with Nurse Maillet's testimony, the SANE exam report was admitted into evidence

at trial, without objection.

Additionally, the State admitted into evidence, without objection, a recorded interview between Defendant and members of the Macon County Sheriff's Office conducted two days after the incident. During the recorded interview, which was played for the jury at trial, Defendant stated several times "I was too drunk[,] I don't remember anything" concerning the night in question. In the interview, when asked by officers "why did you do it," Defendant responded by stating, "I don't know."

On 17 December 2021, the jury found Defendant guilty of second-degree forcible rape, first-degree burglary, interfering with an emergency communication, second-degree kidnapping, and assault on a female. Following the jury's guilty verdicts, the trial court imposed the following active sentences, which were ordered to run consecutively: 96 to 176 months in prison for the conviction for second-degree forcible rape; 84 to 113 months for first-degree burglary; 75 days for interfering with an emergency communication; 33 to 52 months for second-degree kidnapping; and 75 days for assault on a female. Defendant gave oral notice of appeal in open court on this same day.

## II. Analysis

Defendant brings three issues on appeal. We address each in turn.

### A. Motion to Dismiss the Kidnapping Charge.

Defendant first argues the trial court erred in denying his motion to dismiss the charge of second-degree kidnapping. Specifically, Defendant challenges the

State's failure to "introduce sufficient evidence of confinement separate from that which was inherent in the commission of the alleged sexual assault" on K.V. We disagree.

Upon a defendant's motion to dismiss, the question for the trial court is "whether there is substantial evidence (1) of each essential element of the offense charged, or of a lesser offense included therein, and (2) of defendant's being the perpetrator of such offense." *State v. Scott*, 356 N.C. 591, 595, 573 S.E.2d 866, 868 (2002) (citation omitted). Substantial evidence is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *State v. Smith*, 300 N.C. 71, 78-79, 265 S.E.2d 164, 169 (1980). The trial court views the evidence in the light most favorable to the State, giving the State the benefit of all reasonable inferences. *State v. Fritsch*, 351 N.C. 373, 378-79, 526 S.E.2d 451, 455 (2000). "Contradictions and discrepancies [in the evidence] do not warrant dismissal of the case but are for the jury to resolve." *Id.* at 379, 526 S.E.2d at 455. "[I]n borderline or close cases, our courts have consistently expressed a preference for submitting issues to the jury." *State v. Woods*, 275 N.C. App. 364, 368, 853 S.E.2d 177, 180 (2020), *aff'd*, 381 N.C. 160, 871 S.E.2d 495 (2022) (citation omitted).

This Court reviews a trial court's denial of a motion to dismiss *de novo*. *State v. Moore*, 240 N.C. App. 465, 470, 770 S.E.2d 131, 136 (2015) (citation omitted). Under a *de novo* standard of review, the court "considers the matter anew and freely substitutes its own judgment for that of the lower tribunal." *State v. Williams*, 362

N.C. 628, 632-33, 669 S.E.2d 290, 294 (2008) (citation and internal quotation marks omitted).

Kidnapping is defined pursuant to N.C. Gen. Stat. § 14-39:

> Any person who shall unlawfully confine, restrain or remove from one place to another . . . without the consent of such person . . . shall be guilty of kidnapping if such confinement, restraint, or removal is for the purpose of: (1) Holding such other person for ransom or as a hostage or using such other person as a shield or (2) Facilitating the commission of any felony or facilitating flight of any person following the commission of a felony or (3) Doing serious bodily harm to or terrorizing the person so confined, restrained or removed or any other person.

N.C. Gen. Stat. § 14-39(a) (2023). Our case law provides kidnapping has no durational requirements, and instead, lasts until the victim regains her free will. *State v. White*, 127 N.C. App. 565, 571, 492 S.E.2d 48, 51 (1997). Similarly, confinement and restraint need not last for a significant amount of time, nor does removal require asportation of the victim across a substantial distance. *See State v. Fulcher*, 294 N.C. 503, 522, 243 S.E.2d 338, 351 (1978).

"[A] kidnapping charge cannot be sustained if based upon restraint [or confinement] which is an inherent feature of another felony." *State v. Williams*, 308 N.C. 339, 346, 302 S.E.2d 441, 447 (1983). Thus, the restraint for kidnapping "must be an act independent of the intended felony." *State v. Ackerman*, 144 N.C. App. 452, 457, 551 S.E.2d 139, 142 (2001).

The test of the independent act "does not look at the restraint necessary to

commit an offense, rather the restraint that is inherent in the actual commission of the offense." *Williams*, 308 N.C. at 347, 302 S.E.2d at 447. "It has been held, quite properly, that where movement is merely incidental to an assault the prosecution must be for that offense and not for kidnapping." *State v. Ripley*, 360 N.C. 333, 338, 626 S.E.2d 289, 293 (2006) (quoting Rollin M. Perkins, *Criminal Law*, ch. 2, § 7(A)(1), at 178 (2d ed. 1969)). A court may also consider whether the restraint subjected the victim to the type of danger the kidnapping statute was designed to prevent, and whether defendant's acts "increase[d] the victim's helplessness and vulnerability." *State v. Key*, 180 N.C. App. 286, 290, 636 S.E.2d 816, 820 (2006) (citation omitted).

In rape cases, this Court has previously determined a separate charge of second-degree kidnapping requires a defendant's restraint or confinement of the victim to be separate from that necessary to accomplish the rape. *State v. Harris,* 140 N.C. App. 208, 213, 535 S.E.2d 614, 618 (2000). Additionally, we have held acts of confinement or restraint prior to the commission of a rape are separate and distinct from the force used during the rape itself. *See State v. Robertson*, 149 N.C. App. 563, 569, 562 S.E.2d 551, 556 (2002).

In the present case, the State introduced evidence tending to show restraint, which was separate and distinct from that required to accomplish the charge of second-degree forcible rape. Evidence was presented tending to show Defendant and K.V. were engaged in an ongoing struggle. K.V. testified Defendant forced himself into her front door, "intercepted" her as she tried to flee from him, threw her onto her

bed, climbed on top of her and placed his knee in the small of her back while holding both of her wrists behind her back. K.V. began kicking and screaming at Defendant "a dozen or more times" to get out of her house. After her requests were ignored by Defendant, K.V. testified she mentally "moved to the next phase which was to beg him not to hurt [her]." Defendant instead responded, "I've made it this far, I'm going to finish it."

During the physical struggle, K.V. reached for Defendant's cell phone on the bed and attempted to dial 911, but Defendant allegedly grabbed the phone out of K.V.'s hands and threw it against the wall. Defendant continued to restrain K.V. as he forced her to roll over onto her back, and K.V. attempted to resist by kicking Defendant in the face, causing his glasses to fly off his face. The evidence shows K.V. was trapped and restrained in her own bedroom during this physical struggle before Defendant sexually assaulted her. Moreover, after attempting to resist Defendant, K.V. testified she felt helpless, feared for her life, and believed she had the choice to either submit to Defendant's assaults or die. As K.V. attempted to flee after the assaults and rape, Defendant grabbed and ripped off her nightgown, causing her to flee from her own home outside into the night naked.

When viewed in the light most favorable to the State, we hold Defendant's restraints of K.V. were separate and apart from that inherent in the commission of the rape. Therefore, Defendant's motion to dismiss the charge of second-degree kidnapping was properly denied. Defendant's argument is overruled.

**B. The SANE Exam Report and Expert Witness Testimony.**

Next, Defendant contends the trial court plainly erred in admitting the SANE exam report prepared by Nurse Sullivan and in allowing Nurse Maillet to provide "surrogate testimony for Sullivan, in violation of the Confrontation Clause." We disagree.

On appeal, Defendant concedes he failed to object to the admission of Nurse Sullivan's SANE exam report containing her observations of injuries to K.V.'s genital area. Likewise, Defendant acknowledges he failed to object to Nurse Maillet's testimony regarding the report.

"In order to preserve an issue for appellate review, a party must have presented to the trial court a timely request, objection, or motion, stating the specific grounds for the ruling the party desired the court to make if the specific grounds were not apparent from the context." N.C. R. App. P. 10(a)(1). However, in criminal cases,

> an issue that was not preserved by objection noted at trial and that is not deemed preserved by rule or law without any such action nevertheless may be made the basis of an issue presented on appeal when the judicial action questioned is specifically and distinctly contended to amount to plain error.

N.C. R. App. P. 10(a)(4).

Generally, "plain error review is available in criminal appeals for challenges to jury instructions and evidentiary issues." *State v. Miller*, 371 N.C. 266, 268, 814 S.E.2d 81, 83 (2018) (citation omitted). To find plain error, an appellate court must

determine that an error occurred at trial. *State v. Towe*, 366 N.C. 56, 62, 732 S.E.2d 564, 568 (2012). Additionally, the defendant must demonstrate that the error was "fundamental"—meaning the error "had a probable impact on the jury's finding that the defendant was guilty and seriously affect[ed] the fairness, integrity, or public reputation of judicial proceedings." *Miller*, 371 N.C. at 269, 814 S.E.2d at 83 (cleaned up).

> Thus, plain error should only be found where the claimed error is a *fundamental* error, something so basic, so prejudicial, so lacking in its elements that justice cannot have been done, or where the error is grave error which amounts to a denial of a fundamental right of the accused, or the error has resulted in a miscarriage of justice or in the denial to appellant of a fair trial.

*State v. Lane*, 271 N.C. App. 307, 312, 844 S.E.2d 32, 38 (2020) (cleaned up). Courts reverse for plain error only in the "most exceptional cases." *State v. Garcell*, 363 N.C. 10, 35, 678 S.E.2d 618, 634 (2009) (citation omitted).

The Confrontation Clause of the Sixth Amendment to the United States Constitution guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him[.]" U.S. Const. Amend. VI. The Confrontation Clause "bars admission of testimonial evidence unless the declarant is unavailable to testify and the accused has had a prior opportunity to cross-examine the declarant." *State v. Locklear*, 363 N.C. 438, 452, 681 S.E.2d 293, 304 (2009) (citations omitted).

The Supreme Court of the United States noted in *Melendez-Diaz v.*

*Massachusetts* that forensic analyses qualify as testimonial statements subject to the Confrontation Clause. 557 U.S. 305, 310, 129 S. Ct. 2527, 2532, 174 L. Ed. 2d 314, 321 (2009) (holding that reports stating the substance at issue was cocaine was testimonial). Thus, in the present case, the SANE exam report constitutes a testimonial statement. However, as the State notes, the Confrontation Clause is subject to several exceptions that limit its applicability, including that testimonial statements will not be barred when they are admitted for "purposes other than establishing the truth of the matter asserted." *Crawford v. Washington*, 541 U.S. 36, 60 n.9, 124 S. Ct. 1354, 1369, 158 L. Ed. 2d 177, 198 (2004) (citation omitted).

Rule 702 of the North Carolina Rules of Evidence states: "If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert . . . may testify thereto in the form of an opinion[.]" N.C. Gen. Stat. § 8C-1, R. 702(a). North Carolina courts have consistently held

> when an expert gives an opinion, the expert is the witness whom the defendant has the right to confront. In such cases, the Confrontation Clause is satisfied if the defendant has the opportunity to fully cross-examine the expert witness who testifies against him, allowing the factfinder to understand the basis for the expert's opinion and to determine whether that opinion should be found credible.

*State v. Ortiz-Zape*, 367 N.C. 1, 9, 743 S.E.2d 156, 161 (2013) (cleaned up).

An expert witness "may testify as to the testing or analysis conducted by

another expert if: (i) that information is reasonably relied on by experts in the field in forming their opinions; and (ii) the testifying expert witness independently reviewed the information and reached his or her own conclusion in [the] case." *State v. Crumitie*, 266 N.C. App. 373, 379, 831 S.E.2d 592, 596 (2019) (citations omitted). Importantly, "the expert must present an independent opinion obtained through his or her own analysis and not merely 'surrogate testimony' parroting otherwise inadmissible statements." *Ortiz-Zape*, 367 N.C. at 9, 743 S.E.2d at 162 (citation omitted). In short, an expert witness may properly base her independent opinion "on tests performed by another person, if the tests are of the type reasonably relied upon by experts in the field," without violating the Confrontation Clause. *State v. Fair*, 354 N.C. 131, 162, 557 S.E.2d 500, 522 (2001).

In the present case, Nurse Maillet identified herself as a forensic nursing supervisor at the hospital, and who has the responsibility to "go through the other nurse's charting and documentation and photographs and make sure that everything is up to standard." Nurse Maillet testified she has twenty-five years of experience both performing and overseeing sexual assault examinations. The State tendered Nurse Maillet as an expert in sexual assault nurse examinations, and the trial court accepted her as an expert without objection from Defendant. Nurse Maillet testified the protocol for a sexual assault examination includes speaking with the patient and gathering medical history, explaining to the patient what treatments and procedures are offered, gaining the patient's consent as to what procedures and examinations she

would like to undergo, and then conducting a general physical examination as well as the physical collection for the sexual assault kit, including taking photographs of areas on the body that have suffered injury or abnormality.

Nurse Maillet testified that she had an opportunity to review K.V.'s sexual assault examination conducted by Nurse Sullivan. Nurse Maillet affirmed that Nurse Sullivan conducted the SANE exam in accordance with proper procedures and protocols. The SANE exam report conducted on K.V. was admitted into evidence without objection.

Nurse Maillet then provided her own independent opinion of the images taken during K.V.'s examination showing injury to K.V.'s body, which were included in the SANE exam report. Nurse Maillet testified in her review of the photographs indicating bruising, she "found three instances of what [she] consider[s] an incident worth reporting" and the injury she observed "is consistent with blunt trauma, which is what happens during a sexual assault." Nurse Maillet's testimony was based upon her personal knowledge and her professional judgement in her independent review of the information from the SANE exam report. Hence, Nurse Maillet's opinion was her "own independently reasoned opinion" and did not serve as "surrogate testimony parroting the testing analyst's opinion." *Ortiz-Zape*, 367 N.C. at 12, 743 S.E.2d at 163 (citation omitted). Because Nurse Maillet provided her independently reasoned opinion, she is the witness whom Defendant had the right to confront, and which he did confront during cross-examination. *Id.* at 8, 743 S.E.2d at 161. Because there

was no violation of Defendant's rights to confrontation, the trial court did not err, much less plainly err, in admitting the SANE exam report and in allowing Nurse Maillet's testimony.

## C. The Prosecutor's Closing Argument.

In his final argument, Defendant contends that the trial court erred by failing to intervene *ex mero motu* in response to statements made by the Prosecutor during his closing argument. We disagree.

During closing arguments, a lawyer is "to provide the jury with a summation of the evidence, which in turn serves to sharpen and clarify the issues for resolution by the trier of fact, and should be limited to relevant legal issues." *State v. Jones*, 355 N.C. 117, 127, 558 S.E.2d 97, 103 (2002) (cleaned up). In a criminal jury trial, N.C. Gen. Stat. § 15A-123(a) provides specific guidelines for closing arguments:

> During a closing argument to the jury an attorney may not become abusive, inject his personal experiences, express his personal belief as to the truth or falsity of the evidence or as to the guilt or innocence of the defendant, or make arguments on the basis of matters outside the record except for matters concerning which the court may take judicial notice. An attorney may, however, on the basis of his analysis of the evidence, argue any position or conclusion with respect to a matter in issue.

N.C. Gen. Stat. § 15A-1230(a) (2023). Additionally, our Supreme Court has determined that "argument of counsel must be left largely to the control and discretion of the presiding judge and that counsel must be allowed wide latitude in the argument of hotly contested cases." *State v. Monk*, 286 N.C. 509, 515, 212 S.E.2d

125, 131 (1975). Nonetheless, this wide latitude has limitations as a closing argument must: "(1) be devoid of counsel's personal opinion; (2) avoid name-calling and/or references to matters beyond the record; (3) be premised on logical deductions, not on appeals to passion or prejudice; and (4) be constructed from fair inferences drawn only from evidence properly admitted at trial." *Jones*, 355 N.C. at 135, 558 S.E.2d at 108.

We note Defendant's attorney failed to object to the Prosecutor's closing argument, so Defendant "must establish that the remarks were so grossly improper that the trial court abused its discretion by failing to intervene *ex mero motu*. To establish such an abuse, defendant must show that the prosecutor's comments so infected the trial with unfairness that they rendered the conviction fundamentally unfair." *State v. Tart*, 372 N.C. 73, 80-81, 824 S.E.2d 837, 842 (2019) (cleaned up).

Even when an appellate court determines that a trial court erred in failing to intervene *ex mero motu*, a new trial will be granted only if "the remarks were of such a magnitude that their inclusion prejudiced defendant, and thus should have been excluded by the trial court." *Id.* at 82, 824 S.E.2d at 843 (citation omitted).

In the present case, Defendant argues the Prosecutor attempted to undermine Defendant's testimony by pointing out the differences "in his testimony about the sexual encounter with [K.V.] and his previous recorded statement to law enforcement" in describing it as "the evolution of a defense." Specifically, Defendant challenges the following portion of the closing argument:

> So why is this important? Why the change? The rape, voluntary intoxication is not a defense. On May 13th of 2019 [Defendant] was in custody. You've heard testimony that he didn't have a lawyer. "I was too drunk. I don't remember anything." It sounded pretty good, but it's not a defense. What's the only thing left for [Defendant] to avoid facing consequences? It's a red herring all day long. That's why the testimony was what it was. That's why they're excruciating minute details about all of these interactions with [K.V.] that she didn't testify about that he didn't tell Detective Burrows or Detective Wright about. Consent is the last card that could be played. The burglary, kidnapping, interfere with emergency communications, voluntary intoxication is a defense. Go back one. Why is that important? [Defendant's] recall and memory and testimony from the stand only involved consent. He doesn't remember anything else to do with these crimes where voluntary intoxication is a defense, nothing. He's like a light bulb except only when it's convenient for him and his case.

Defendant contends "[t]here was absolutely no support in the evidence for this comment, which suggested that [he] testified falsely in accordance with the advice he received from his lawyers."

When making closing arguments, prosecutors may argue based on the law, the facts in evidence, and "all reasonable inferences drawn therefrom." *State v. Alston*, 341 N.C. 198, 239, 461 S.E.2d 687, 709 (1995) (citation omitted). Additionally, attorneys may properly refer to evidence of prior misconduct by the defendant to make arguments regarding the defendant's credibility. *State v. Bondurant*, 309 N.C. 674, 688, 309 S.E.2d 170, 179 (1983).

Here, the Prosecutor's closing statements were consistent with the record, as

his arguments highlighted the differences between Defendant's statements to the police two days after the incident, which were properly admitted at trial, and Defendant's own testimony during his trial. When viewing this argument in light of the overall factual circumstances to which it refers, it is clear the Prosecutor was making a credibility argument against Defendant. This questioning of Defendant's credibility was reasonably inferred from the record and did not violate the requirements of N.C. Gen. Stat. § 15A-1230. Thus, the Prosecutor's remarks were not grossly improper or so extreme and of such a magnitude that their inclusion in the State's argument prejudiced Defendant by rendering the proceedings fundamentally unfair.

## III.    Conclusion

For the reasons stated above, we conclude Defendant received a fair trial, free from error.

NO ERROR.

Judges TYSON and COLLINS concur.